IN THE
UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
ROCK ISLAND DIVISION

| | |
|---|---|
| CLINTON PUSHETONEQUA,<br>    Plaintiff,<br><br>v.<br><br>COMMISSIONER OF SOCIAL<br>SECURITY,<br>    Defendant. | Case No. 4:17-cv-04027-JEH |

**Order and Opinion**

Now before the Court is the Plaintiff Clinton Pushetonequa's Motion for Summary Judgment (Doc. 11) and the Commissioner's Motion for Summary Affirmance (Doc. 13).[1] For the reasons stated herein, the Court DENIES the Plaintiff's Motion for Summary Judgment and GRANTS the Defendant's Motion for Summary Affirmance.[2]

**I**

On August 23, 2013, Pushetonequa filed applications for Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI) alleging disability beginning on March 30, 2008 (subsequently amended to February 1, 2011). His claims were denied initially on November 21, 2013 and were denied upon reconsideration on February 18, 2014. On March 31, 2014, Pushetonequa filed a request for hearing concerning his applications for DIB and SSI. A hearing was held before the Honorable David W. Thompson (ALJ) on July 22, 2015. At the hearing Pushetonequa was represented by counsel and a Vocational Expert (VE) testified. Following the hearing,

---

[1] The parties consented to the jurisdiction of a U.S. Magistrate Judge. (Docs. 9, 10).
[2] References to the pages within the Administrative Record will be identified by AR [page number]. The Administrative Record appears as (Doc. 6) on the docket.

Pushetonequa's claims were denied on August 13, 2015. His request for review by the Appeals Council was denied on December 14, 2016, making the ALJ's Decision the final decision of the Commissioner. Pushetonequa filed the instant civil action seeking review of the ALJ's Decision on January 27, 2017.

## II

At the time he applied for benefits, Pushetonequa was 28 years old living in Davenport, Iowa with his girlfriend and infant daughter. On his Form SSA-3368, Pushetonequa listed all the mental conditions that limited his ability to work as follows: Post Traumatic Stress Disorder (PTSD), severe depression, anxiety; severe depression; PTSD; and anxiety disorder. AR 256.

At the hearing, Pushetonequa testified that he last worked in February 2011 as a full-time mold injection operator. He had that job for approximately one year, and it came to an end when his employer let him go due to the amount of days he missed because of his anxiety. He also testified that he became unable to do that job because he starting "thinking about stuff" and things went downhill from there. AR 54.

He testified that he was not currently taking any medications, was able to take care of his personal hygiene, and he was able to prepare meals for himself. He did the household cleaning. He had lived with his girlfriend for three years and they met through his uncle. He never had a driver's license and did not go out and visit other people, friends, neighbors, or relatives and no one visited him. Pushetonequa further testified that he left the house about once per week and when he did so, he took his daughter to her grandmother's house. He did not stay at her house very long, maybe five to ten minutes. Pushetonequa said he otherwise did not leave the house or spend time on the telephone with anyone. He spent his days with his daughter watching cartoons and otherwise taking care of her. The last time he was hospitalized for mental health issues was in the fall of 2014 which was the last time he went to the emergency room for any mental health issues.

When asked by his attorney what could help Pushetonequa, he responded that he should see a different psychologist. He explained that he stopped going to Vera French Mental Health Center in Davenport, Iowa because he moved to a different state and Vera French had a long waiting list "and stuff." AR 50. Pushetonequa stated that the last time he was on medication was "maybe 2013" and it was medication for anxiety and sleeping pills. AR 51. He was unsure of whether the medication was for depression specifically. He said the medication made his ability to go out and do things worse. When records suggesting he had a history of not taking his medications as directed and not wanting to take his medications were pointed out, Pushetonequa explained that he feared pills, and he did not like the way they made him feel.

Pushetonequa testified that his daughter's grandmother sometimes came over to his house several times a day as a way to check on Pushetonequa to see if he needed help. He said that during anxiety or panic attacks, he coped by laying down to control his breathing and relax until the attack passed. He described his attacks as causing him neck and chest tightness and shortness of breath. Those sensations lasted for about 15 minutes to one hour or more at a time, sometimes about eight to twenty times a week. Pushetonequa stated that his episodes were triggered by loud noises and thinking about anxiety and all the things he had been through in his life.

Pushetonequa testified that he did not think he would be able to work if he were able to take medications because he could not be around people, new faces, and new surroundings and was always looking for a way out. When asked further whether he believed he would be able to work a fairly routine and simple job where his supervisor would come by once in a while, Pushetonequa responded that he did not think he could do an eight-hour a day 40-hour a week job because it was hard to focus and he worried. Pushetonequa also testified that he thought his anxiety, panic, and depression affected the way he was able to do things around the house because "sometimes I have to stop and lay down and stuff, so it affects me." AR 57.

He stated that he wanted to get better and growing up, he always worked and he enjoyed working, but he currently did not see any hope. He also previously worked manufacturing antifreeze and as a janitor. He did not believe he could work as a janitor anymore because it would be hard to follow instructions and be efficient.

The ALJ then questioned the VE, Alfred Walker. The ALJ first questioned the VE based upon a 30 year old hypothetical individual with the same education and experience as Pushetonequa:

> Because of the individual's mental impairments and symptoms combined, the individual may, during times of symptoms exacerbation, have moderate limitations in one, concentration, persistence, and/or pace, but [sic] attempting complex or detailed tasks. So the individual is limited to jobs that do not require complex or detailed thought processing, little in the way of change and job process from day to day, jobs that can be learned in 30 days or fewer, and jobs with multi-step, self-evident tasks easily resumed after momentary distraction, and, two, social functioning. So the individual is limited to jobs that do not require more than occasional work-related interaction with the public, co-workers, and supervisors. How would these restrictions affect the performance of Claimant's past relevant work?

AR 64. The VE responded that the individual could still work as an injection molding machine operator, packager, and groundskeeper (Pushetonequa's past relevant work). The ALJ then asked the VE to assume the individual would miss four or more days of work per month. The VE explained that would exceed the employer's expectations and so the individual could not maintain competitive employment at that level of absenteeism. In the VE's opinion, at that level of employment, eight to 10 absences per year were allowed. The ALJ next asked the VE to assume the individual, for whatever reason, may need to be redirected on the job periodically so that the individual would be less than 80% productive while on the job. The VE testified that would not be acceptable to an employer and the individual would lose his employment. The VE explained that the expected minimum level of productivity would be 90%.

Pushetonequa's attorney then questioned the VE. The attorney changed the first hypothetical to include moderate problems with concentration, persistence, and pace when the individual was performing even simple, routine, repetitive tasks. The VE responded that it depended upon how such problems effected the individual's productivity. The attorney also ascertained that the first hypothetical as presented by the ALJ did not contain moderate problems with concentration, persistence, and pace when performing even simple, routine, repetitive tasks. The attorney then asked if a person who maintained a 90% efficiency or productivity level for 90% of the time and who maintained an 80% efficiency level for 10% of the day would still be below the minimum level required. The VE responded in the affirmative. The attorney last asked the VE whether the individual with an inability to consistently respond appropriately to criticism or accepting instructions from the supervisor would change anything. The VE responded that the individual would eventually lose his employment.

### III

In his Decision, the ALJ determined that Pushetonequa had the following severe impairments: affective disorders, anxiety disorders, and a conduct disorder. The ALJ made the following residual functional capacity (RFC) finding:

> After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform a full range of work at all exertional levels but with the following non-exertional limitations: because of all the individual's mental impairments and symptoms combined, the individual may, during times of symptoms exacerbation have moderate limitations in (1) concentration, persistence and/or pace when attempting complex or detailed tasks, so the individual is limited to jobs that do not require complex or detailed job processes, little in the way of change in job process from day to day, jobs that can be learned in 30 days or fewer, and jobs with multi-step, self-evident tasks, easily resumed after momentary distraction, and (2) social functioning, so the individual is limited to jobs that do not require more than occasional work related interaction with the public, co-workers and supervisors.

AR 27-28.

The ALJ discussed Pushetonequa's testimony and other statements in the record and those of his girlfriend. The ALJ recited the November 2013 and February 2014 state agency reviewing psychologists' assessments which provided Pushetonequa was mildly to moderately limited, functionally, due to his impairments, and those impairments did not prevent his from performing most mental activities of work and moderately limited his ability to perform a few mental activities of work. The first assessment also provided that Pushetonequa was capable of performing a significant number of other unskilled jobs. The second assessment provided that Pushetonequa's mental limitations allowed him to perform a wide range of unskilled work at all exertional work activity levels, and he was capable of performing a significant number of jobs.

The ALJ detailed Pushetonequa's trips to Vera French beginning in April 2013. He presented with problems due to anxiety and symptoms of depression. The ALJ noted when Pushetonequa was prescribed psychotropic medications to treat anxiety and depression. Late in 2013, Pushetonequa continued to be diagnosed with moderate major depressive disorder, panic disorder with agoraphobia, and possible posttraumatic stress disorder and the symptoms of those disorders were moderate. His various GAF scores between 50 and 55 were listed. The ALJ stated that a GAF of 52 was assessed in November 2013. AR 24.

The ALJ also detailed Pushetonequa's consultative psychological examination by Laura Stradwick, Psy.D. in October 2013 during which time Pushetonequa was candid about his past including his frequent altercations as a teenager, his time spent in jail, and his time spent in prison on a willful injury charge. Dr. Stradwick reported Pushetonequa was assessed with a GAF of 55. While he was fully oriented and his memory, recent and remote, was intact, Pushetonequa had significant impairment in

immediate and short-term memory but was able to perform in the average range on simple mathematical calculations.

The ALJ noted Pushetonequa's allegation that he was unable to leave his residence and also noted that he did leave his residence including to visit an emergency room to treat transitory problems during times in 2011 through 2013. Pushetonequa was treated at the hospital overnight on September 20, 2014 after his girlfriend found him with a rope around his neck and threatening to kill himself though he was not suspended when she discovered him.  At that time, he tested positive for cannabis.  He refused psychiatric hospitalization and medication.

The ALJ discussed other medical evidence of record which showed that:

> [W]hen using medication as directed and with when [sic] being compliant with treatment for his mental impairments (including attending psychotherapy sessions), he has increased his ability to function and reported reduced symptoms of mental distress (2F and 4F).

AR 26.  The ALJ again noted that Pushetonequa refused to use prescribed medication to reduce mental distress.

The ALJ explained that Pushetonequa had mild restriction in activities of daily living, moderate difficulties in social functioning, moderate difficulties with regard to concentration, persistence or pace, and one to two episodes of decompensation, each of extended duration.  After the ALJ articulated his RFC finding, he stated:

> The record does not include objective psychological or psychiatric test results showing a disabling mental impairment, when the claimant provides his best effort.  The medical evidence of record does not include other test results showing a disabling impairment; the objective medical evidence does not support the claimant's allegation of complete and total disability.

AR 28.  From there, the ALJ again addressed Pushetonequa's description of his daily activities, his "contradictions and fabrications [that] undermine his credibility," and the state agency findings.  AR 29-30.

The ALJ dedicated a separate paragraph of the Decision to Pushetonequa's GAF scores. The ALJ said:

> As for the opinion evidence, mental health professionals have, at times, rated the claimant to be functioning at a rate (50) on the global assessment of functioning (GAF) scale indicative of the inability to work (2F and 4F); but these ratings are based on the uncorroborated subjective statements of the claimant and as found above, the claimant is not credible. At other times, the claimant has been rated at levels of functioning (52 and 55) indicative of the ability to work (3F and 4F). The undersigned notes that the global assessment of functioning scale rate is not to be used as an assessment of an individual's ability to perform work-related activities, but rather it is a tool in the diagnosis and treatment of individuals with mental disorders. The global assessment of functioning scale rate incorporates the other four parts of a formal psychiatric diagnosis, and the global assessment of functioning rate is a reflection of these other diagnostic items, including stresses such as unemployment, family problems, financial difficulties, etc. The global assessment of functioning scale rate therefore is not a reliable indication of an individual's ability (or inability) to perform mental work-related activities, and assessments using the global assessment of functioning scale are not afforded significant probative value.

AR 29-30.

## IV

Pushetonequa argues: 1) remand is required to apply the Commissioner's clarified policy on assessing a claimant's symptoms; 2) the ALJ erred in finding that GAF scores are not probative of the severity of mental illness; and 3) the ALJ's finding of mental RFC and questions to the VE do not convey any limitations in concentration, persistence or pace when doing unskilled work.

The Court's function on review is not to try the case de novo or to supplant the ALJ's findings with the Court's own assessment of the evidence. *See Schmidt v. Apfel*, 201 F.3d 970, 972 (7th Cir. 2000); *Pugh v. Bowen*, 870 F.2d 1271 (7th Cir. 1989). Indeed, "[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). Although great

deference is afforded to the determination made by the ALJ, the Court does not "merely rubber stamp the ALJ's decision." *Scott v. Barnhart*, 297 F.3d 589, 593 (7th Cir. 2002). The Court's function is to determine whether the ALJ's findings were supported by substantial evidence and whether the proper legal standards were applied. *Delgado v. Bowen*, 782 F.2d 79, 82 (7th Cir. 1986). Substantial evidence is defined as such relevant evidence as a reasonable mind might accept as adequate to support the decision. *Richardson v. Perales*, 402 U.S. 389, 390 (1971), *Henderson v. Apfel*, 179 F.3d 507, 512 (7th Cir. 1999).

In order to qualify for disability insurance benefits, an individual must show that his inability to work is medical in nature and that he is totally disabled. Economic conditions, personal factors, financial considerations, and attitudes of the employer are irrelevant in determining whether a plaintiff is eligible for disability. *See* 20 C.F.R. § 404.1566; 20 C.F.R. § 416.966 (1986).[3] The establishment of disability under the Act is a two-step process.

First, the plaintiff must be suffering from a medically determinable physical or mental impairment, or combination of impairments, which can be expected to result in death, or which has lasted or can be expected to last for a continuous period of not less than 12 months. 42 U.S.C. § 423(d)(1)(A). Second, there must be a factual determination that the impairment renders the plaintiff unable to engage in any substantial gainful employment. *McNeil v. Califano*, 614 F.2d 142, 143 (7th Cir. 1980). The factual determination is made by using a five-step test. *See* 20 C.F.R. § 404.1520. In the following order, the ALJ must evaluate whether the claimant:

1) currently performs or, during the relevant time period, did perform any substantial gainful activity;

2) suffers from an impairment that is severe or whether a combination of her impairments is severe;

---

[3] The standards for establishing a disability in order to receive DIB and SSI are materially the same. *Compare* 20 C.F.R. § 404.1501 *et seq.* (DIB) *with* 20 C.F.R. § 416.901 *et seq.* (SSI). Thus, the Court may at times only cite to the DIB regulations.

> 3) suffers from an impairment which meets or equals any impairment listed in the appendix and which meets the duration requirement;
>
> 4) is unable to perform her past relevant work which includes an assessment of the claimant's residual functional capacity; and
>
> 5) is unable to perform any other work existing in significant numbers in the national economy.

*Id*. An affirmative answer at any step leads either to the next step of the test, or at steps 3 and 5, to a finding that the plaintiff is disabled. A negative answer at any point, other than at step 3, stops the inquiry and leads to a determination that the plaintiff is not disabled. *Garfield v. Schweiker*, 732 F.2d 605 (7th Cir. 1984).

The plaintiff has the burdens of production and persuasion on steps 1 through 4. However, once the plaintiff shows an inability to perform past work, the burden shifts to the Commissioner to show ability to engage in some other type of substantial gainful employment. *Tom v. Heckler*, 779 F.2d 1250 (7th Cir. 1985); *Halvorsen v. Heckler*, 743 F.2d 1221 (7th Cir. 1984).

In the instant case, Pushetonequa claims error on the ALJ's part at Step Four.

### A

First, Pushetonequa argues that the ALJ applied the earlier, erroneous interpretation of the Commissioner's policy SSR 96-7p and assessed the "credibility" of Pushetonequa's statements as that term was previously understood. He contends that remand is required to command the ALJ to apply the proper standard as enunciated in SSR 16-3p. The Commissioner counters that the ALJ applied the correct legal standard in evaluating Pushetonequa's symptoms, and the ALJ properly evaluated, per SSR 16-3p, the consistency of his statements with the record as a whole rather than passing judgment on his character.

In this case, the ALJ issued her Decision before the Social Security Administration issued Social Security Ruling 16-3p which supersedes SSR 96-7p. The new SSR directs the ALJ to focus on the "intensity and persistence of the applicant's symptoms" rather than on "credibility." *Schuck v. Berryhill*, No. 16 C 5936, 2017 WL 2798390, at *5 (N.D. Ill. June 28, 2017), *quoting Cole v. Colvin*, 831 F.3d 411, 412 (7th Cir. 2016). Because SSR 16-3p only clarifies the SSA's interpretation of existing law, that new ruling applies to Pushetonequa's arguments in this case. *Schuck*, 2017 WL 2798390, at *5. SSR 16-3p still requires the ALJ to consider factors in evaluating the intensity, persistence, and limiting effects of a claimant's symptoms including testimony, objective medical treatment, medication and its side effects, non-medication treatments, daily activities, and any measures other than treatment an individual uses or has used to relieve pain or other symptoms (e.g. standing for 15 to 20 minutes every hour). *Id.*, *citing* SSR 16-3p, 2016 WL 1119029, at *4-7. Per SSR 16-3p, "The focus of the evaluation of an individual's symptoms should not be to determine whether he or she is a truthful person."

The ALJ in this case engaged in the appropriate analysis under SSR 16-3p. His use of the word "credibility" is beside the point, as that was still a commonly used term under SSR 96-7p which was applicable at the time the ALJ issued his Decision. More importantly, the ALJ cited to the evidence of record which indicated: he was able to leave his residence to visit an emergency room to treat transitory problems in 2011 through 2013; he was able to leave his home to interact, when necessary, with his girlfriend's parents; he was able to leave his home to attend his girlfriend's family functions; and he was able to interact with an uncle in the area who introduced Pushetonequa to his girlfriend.

Also, the ALJ pointed to Pushetonequa's daily activities in support of his conclusion that those activities "belie[d] the allegation of complete and total disability." AR 28. The ALJ referenced Pushetonequa's wide-ranging activities during the day including attending to his own and his child's needs, cooking, cleaning his house extremely well, playing with his daughter, and interacting with his

11

girlfriend's family for short periods of time when necessary. Particularly with regard to the medical evidence of record, the ALJ cited the instance during counseling in November 2013 when Pushetonequa said that he tried to manufacture an anxiety attack, but he stopped doing so as he feared that it would get out of control. AR 448. That same counseling note stated that Pushetonequa "tentatively agreed that staying at home not only permit[ted] him to take care of the baby, but also to avoid having to go anywhere using the baby as an excuse." AR 447-48. During an ER visit in September 2014, Pushetonequa remained silent when asked whether he used any drugs that night or the day before though he later tested positive for cannabis. The ALJ then considered Pushetonequa's conservative medication use and the fact that he had no disabling side effects when he did use medication (though he alleged to the contrary).

A review of the ALJ's Decision as a whole makes obvious that the ALJ engaged in the proper analysis under clarifying ruling SSR 16-3p. In fact, the ALJ's express statements lend further support to the conclusion that his analysis was correct and within bounds. He wrote:

> These other factors [of no physicians or mental health professional reporting Pushetonequa disabled, no disabling medication side effects, conservative medication measures], the description of daily activities, the claimant's contradictions and fabrications, and the objective medical evidence concerning the claimant's impairments all contradict the allegation of complete and total disability; the claimant's testimony that he is unable to work therefore is not credible.

AR 29. The Court can easily trace the path of the ALJ's reasoning as it pertains to SSR 16-3p. *See Carlson v. Shalala*, 999 F.2d 180, 181 (7th Cir. 1993) (stating that an ALJ must "sufficiently articulate [her] assessment of the evidence to assure us that the ALJ considered the important evidence . . . and to enable us to trace the path of the ALJ's reasoning"). The ALJ's errant statements regarding the difficulty to believe that Pushetonequa did not live together with his girlfriend before they decided to cohabitate do not somehow void the remainder of the ALJ's proper SSR 16-3p

12

analysis. The Court thus finds that the ALJ's assessment of Pushetonequa's symptoms is supported by substantial evidence.

B

Next, Pushetonequa argues that the ALJ illegally discounted the opinions of his treating sources of the severity of his mental condition by discounting a series of GAF scores as not probative. The Commissioner argues that the ALJ did not rely on an isolated GAF score as evidence that Pushetonequa's functioning was greater than alleged, the ALJ properly found that GAF scores reflect issues extraneous to the disability inquiry, and the ALJ correctly observed that GAF scores are not medical evidence.

"[N]owhere do the Social Security regulations or case law require an ALJ to determine the extent of an individual's disability based entirely on his GAF score." *Denton v. Astrue*, 596 F.3d 419, 425 (7th Cir. 2010), *quoting Wilkins v. Barnhart*, 69 F. App'x 775, 780 (7th Cir. 2003). A GAF score does not reflect the clinician's opinion of functional capacity. *Id*. Nevertheless, an ALJ may not ignore or discount evidence of multiple favorable GAF scores suggesting a far lower level of functioning. *Yurt v. Colvin*, 758 F.3d 850, 860 (7th Cir. 2014).

The Court finds no error in the ALJ's consideration of Pushetonequa's GAF scores. First, the Court already determined as discussed *supra* that the ALJ did not err in evaluating the intensity, persistence, and limiting effects of Pushetonequa's symptoms under SSR 16-3p. The ALJ did not therefore err by relying, in part, upon that "credibility" determination when he rejected the GAF scores as lacking any significant probative value. Second, the ALJ did not simply dismiss a series of GAF scores which suggested a lower level of functioning than the one found in the ALJ's RFC and hypothetical questions to the VE. Instead, as the Commissioner points out, the ALJ noted the varying GAF scores in his Decision and gave *all of them* little weight for clearly articulated reasons. When the Decision is read as a whole, as it must be, the ALJ's decision to *not* afford significant probative value to Pushetonequa's GAF scores is

sufficiently supported. *See Rice v. Barnhart*, 384 F.3d 363, 369 (7th Cir. 2004) (explaining that a court will give an ALJ's opinion a commonsensical reading rather than nitpicking at it). The ALJ placed the various GAF scores of record against the other evidence of record spanning Pushetonequa's testimony, counseling records, other medical records, and Pushetonequa's description of his daily activities. This case is not one in which the ALJ cherry picked evidence to support his opinion without regard for an entire line of evidence to the contrary. *See Zurawski v. Halter*, 245 F.3d 881, 888 (7th Cir. 2001) (stating that it was worth repeating that an ALJ may not ignore an entire line of evidence that is contrary to his findings). In fact, the ALJ correctly considered the evidence of Pushetonequa's GAF scores (both favorable and unfavorable to him) in light of the voluminous other evidence of record (both favorable and unfavorable to Pushetonequa).

## C

Finally, Pushetonequa argues that the ALJ committed reversible error because he failed to account for limitations in concentration, persistence or pace when performing the mental functions of unskilled work in his RFC finding and questions to the VE. Pushetonequa further argues that the ALJ failed to justify his finding that Pushetonequa's mental limitations arose only when performing complex or detailed tasks. The Commissioner disputes that the ALJ's RFC finding and questions to the VE were unjustified where the mental RFC assessment was supported by the state agency psychological consultants' opinions. The Commissioner contends that Pushetonequa's reliance on particular case law is inapposite and reliance on agency guidance is misguided.

State agency psychological consultant Jennifer, Ryan, Ph.D., stated on her November 20, 2013 Consultative Examination (CE) form:

> Objective findings are consistent with limitations in *capacity to remember and carry out complex instructions and to sustain concentration and pace for more than simple tasks.* Function information indicates the capacity for routine tasks.

AR 89 (emphasis added). Dr. Ryan included the information Dr. Stradwick detailed in her November 5, 2013 Psychological Evaluation report that Pushetonequa's "attention

and concentration are likely to be variable and production is likely to be inconsistent." AR 89. Dr. Stradwick's Psychological Evaluation also included in the "Summary" section of her report, among other things:

> [Pushetonequa] may have periods when he is able to understand and complete tasks and periods of not being able to maintain concentration and pace or carry out instructions . . . If Mr. Pushetonequa is better able to manage symptoms of depression and anxiety, he may be more successful at navigating the social environment, as well as able to maintain concentration and pace and carry out instructions.

AR 428. Dr. Ryan's initial decision was affirmed by state agency consultative examiner Scott Shafer, Ph.D. on February 18, 2014.

The ALJ's RFC finding provided in relevant part that Pushetonequa, during times of symptoms exacerbation, may have moderate limitations in concentration, persistence and/or pace when attempting complex or detailed tasks. AR 27. The ALJ discussed the state agency consultants' findings in her Decision, stating that those findings were supported by the record and their assessments were afforded some probative weight. The ALJ further explained that the RFC supplanted that of the state agency because the current RFC assessment was based on all the evidence or record including evidence not before the state agency. AR 30. Earlier in her Decision, the ALJ summarized Dr. Stradwick's report and stated:

> It was a reported [sic] that [Pushetonequa] may have periods when he is able to understand and complete tasks and also periods of not being able to maintain concentration, pace, or carry out instructions. He showed only mild cognitive impairment in his attention and concentration.

AR 25. All these references in the Decision to discrete parts of the record make it quite easy for the Court to conclude that the ALJ built a logical bridge between the evidence of record and that part of the RFC providing that Pushetonequa during times of symptoms exacerbation, may have moderate limitations in concentration, persistence and/or pace when attempting complex or detailed tasks. *See Berger v. Astrue*, 516 F.3d 539, 544 (7th Cir. 2008) (stating that when an ALJ recommends the agency deny benefits, it must

first build an accurate and logical bridge from the evidence to the conclusion). Thus, Pushetonequa's argument in this regard fails.

His argument that the ALJ failed to account for limitations in concentration, persistence or pace when performing the mental functions of unskilled work fares no better. Pushetonequa essentially argues that different provisions of POMS DI 25020.010[4] reveal that the ALJ's mental RFC and questions to the VE fell short. He also argues that the mental RFC and questions to the VE ran afoul of Seventh Circuit case law providing that certain hypotheticals to VEs impermissibly do not account for limitation in concentration, persistence or pace. The Commissioner's responses to these two points are well taken. As the Commissioner notes, 25020.010(B)(3)(d) (Mental Abilities Critical for Performing Unskilled Work) states a claimant must show the ability to "maintain attention for extended periods of 2-hour segments (*concentration is not critical*)." POMS DI 25020.010(B)(3)(d) (emphasis added). The Commissioner also correctly points out that the ALJ in this case did as the Seventh Circuit suggested in *O'Connor-Spinner v. Astrue*, namely, to "include all of [the claimant's limitations] directly in the hypothetical." 627 F.3d 614, 619 (7th Cir. 2010). Notably, the ALJ in this case did not limit the hypothetical to merely an individual with moderate limitations in concentration, persistence, and/or pace when attempting complex or detailed tasks. The ALJ went on:

> So the individual is limited to jobs that do not require complex or detailed thought processing, little in the way of change and job process from day to day, jobs that can be learned in 30 days or fewer, and jobs with multi-step, self-evident tasks easily resumed after momentary distraction . . . .

AR 64. Pushetonequa would have this Court find error on the ALJ's part because the RFC finding and questions to the VE did not orient the VE to moderate problems with concentration, persistence, and pace when performing even simple, routine, repetitive tasks. As detailed above, Pushetonequa's attorney at the hearing made it a point to highlight the fact that the ALJ's hypotheticals to the VE did not include any such

---

[4] Pushetonequa says while the Commissioner's Program Operations Manual System (POMS) do not bind the courts they do bind ALJs. SSR 13-2p.

limitations.  But what Pushetonequa believes was fully supported by the record and therefore necessary to include in the RFC and question to the VE is beside the point.  The ALJ never did find such moderate difficulties with simple, routine, repetitive tasks supported by the record, and he therefore committed no error by failing to account for such difficulties in the RFC or questions to the VE.

Ultimately, the ALJ's RFC finding and questions to the VE are above reproach on all the bases Pushetonequa puts forth.  Simply put, the ALJ's RFC finding is supported by substantial evidence.  It is obvious that he crafted it after proper consideration of the state agency's CEs, Dr. Stradwick's Psychological Evaluation, Pushetonequa's treatment records, and all other relevant evidence and agency policy.  The Court further concludes that the ALJ's hypotheticals to the VE adequately addressed Pushetonequa's limitations as the ALJ *actually* found supported by the record evidence.

## V

For the foregoing reasons, the Plaintiff's Motion for Summary Judgment (Doc. 11) is DENIED and the Commissioner's Motion for Summary Affirmance (Doc. 13) is GRANTED.  This matter is now terminated.

*It is so ordered.*

Entered on October 4, 2017.

s/Jonathan E. Hawley
U.S. MAGISTRATE JUDGE